# United States Tax Court

T.C. Memo. 2023-5

PAUL C. WONDRIES AND PATRICIA WONDRIES,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 13345-19.                        Filed January 9, 2023.

————

*Edward O. C. Ord* and *Cheng Zhang*, for petitioners.

*Sarah A. Herson* and *Mark A. Nelson*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, *Chief Judge*:  Respondent determined the following deficiencies and penalties with respect to petitioners' federal income tax for years 2015–17 (years in issue):

| Year | Deficiency | *§ 6662(a) Penalty* |
|------|------------|---------------------|
| 2015 | $214,226 | $42,845 |
| 2016 | 102,698 | 20,540 |
| 2017 | 104,579 | 20,916 |

[*2]    After concessions[1] the issues for consideration are whether (1) petitioners are entitled to deductions for expenses reported on the Schedules F, Profit or Loss From Farming, attached to their 2015, 2016, and 2017 federal income tax returns and (2) petitioners are liable for accuracy-related penalties pursuant to section 6662(a) for 2015 and 2016.

Unless otherwise indicated, all section references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Some of the facts are stipulated and so found.  The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference.  Petitioners were married and resided in California when they timely filed their Petition.

During the years preceding those in issue petitioner husband operated many successful business enterprises.  These included some 23 car dealerships, half of which he managed to convert from losing enterprises to profitable ones.

Around early 2004 petitioners sought to diversify their business interests by acquiring a cattle ranch.  They toured many properties before ultimately deciding on an 1,100-acre ranch in Parkfield, California (ranch).  Various structures stood on the property: a main house, a guest house, a swimming pool, and a foreman's house.  Wells and natural springs serviced the ranch's water needs; petitioners also installed large storage tanks and drinking troughs for the animals. Approximately 30 miles of roads provided access to all parts of the ranch.

Petitioners financed the ranch's purchase through a California bank.  In support of their loan application, they included a business plan indicating that the ranch would generate sufficient income to satisfy the

---

[1] Petitioners conceded that they are required to include an individual retirement account (IRA) distribution from NADART in income for 2015.  NADART is the financial services and retirement planning division of the National Automobile Dealers Association.  Respondent conceded the penalty pursuant to section 6662(a) for petitioners' 2017 underpayment.

[*3] mortgage payments—primarily through cattle sales and guided hunting expeditions—and be profitable within a few years. Their secondary approach was to hold the property for investment. The bank funded the loan, and petitioners purchased the property for $2 million— approximately $1 million below the listing price.

Because they had no experience in the ranching industry, petitioners hired a foreman, Robert Palm. Mr. Palm was familiar with the area, having grown up there, and knew many individuals in the industry. He also had approximately two decades of ranching experience, managing properties in California, Nevada, Oregon, Idaho, Texas, and Nebraska. Notably, he had managed profitably two ranches—both over 1,000 acres—close to petitioners' ranch.

Mr. Palm began his employment with petitioners as of the property closing date. His duties included overseeing the property when petitioners were away, repairing and replacing ranch equipment and infrastructure, hiring and overseeing laborers to perform more extensive tasks, managing the cattle herd, controlling the landscape, and tending the ranch's crops. As part of those duties, petitioners provided Mr. Palm with a separate checkbook and a credit card for ranch purchases.

Petitioners realized quickly that operational income from the ranch alone would be insufficient to support the mortgage payments. They discovered that raising cattle would be cost prohibitive given feed prices. The initial plan was to feed the cattle by having them graze in the fields and secondarily with barley grown on the property.

An unexpected drought resulted in insufficient grass and barley to feed the herd. Petitioners researched the cost of purchasing feed from third parties but found this to be infeasible given current beef prices. Thus within a few months of purchasing the ranch, petitioners sold most of the cattle.

Petitioners also determined at this time that guided hunting would not generate a profit. Not only was the ranch too small to sustain the wild animals that hunters seek, the insurance requirements and attendant liability risks significantly outweighed the potential revenue that providing hunting expeditions could yield.

In the light of these failed exploits, petitioners pivoted from an operational focus to an investment one, hoping to eventually sell the property at a gain. They endeavored to improve the property by

[*4] repairing the fencing and irrigation system, renovating the housing structures and pool, clearing brush for fire control, and maintaining the grounds surrounding the buildings. Petitioners usually had the foreman and third-party contractors complete these tasks, but when they visited the ranch—approximately six days per month—they would contribute by performing tasks around the ranch.

When petitioners take vacation time, they visit one of their other homes. They own residences in Palm Springs, California, Big Bear Lake, California, and Las Vegas, Nevada. They also travel abroad extensively, taking trips to Europe, Asia, and Africa in past years.

Petitioner husband performed the accounting and payroll function for the ranch. He maintained a running total of expenses incurred throughout the year as well as copies of checks and receipts. This method of recordkeeping differs from petitioner husband's dealership businesses, which use automated professional software to manage payroll and accounting.

Petitioner husband engaged the accountant from his automotive businesses to periodically review his ranch accounting work. Petitioner husband's management style for the ranch is similar to his management style for the automotive businesses: He hired experienced individuals to oversee the businesses' day-to-day affairs, and he checked in with these managers intermittently for status updates.

Since acquiring the ranch, petitioners have never realized a profit nor broken even. They have realized a net loss every year since purchase and have claimed corresponding deductions. For the years in issue petitioners reported the following income and expenses for the ranch:

| Year | Income | Expense | Loss |
|------|--------|---------|------|
| 2015 | $892 | $474,793 | ($473,901) |
| 2016 | 12,485 | 235,580 | (223,095) |
| 2017 | 10,627 | 239,751 | (229,124) |

Petitioner husband was an employee of AGL Development during the years in issue. He accordingly reported wage income from Form W–2, Wage and Tax Statement, for 2015–17. Petitioners also reported income on their Schedules E, Supplemental Income and Loss, for

[*5] businesses associated with petitioner husband's car dealerships. Their wage and Schedule E income as well as their total income is set out below:

| Year | Wage Income | Schedule E Income | Total Income[2] |
|------|-------------|-------------------|------------------|
| 2015 | $4,314,921 | $6,861,912 | $11,099,715 |
| 2016 | 4,790,000 | 6,836,947 | 12,376,821 |
| 2017 | 3,541,246 | 4,981,222 | 9,259,687 |

In addition to business-related income, petitioner husband received the following IRA distributions in 2015: (1) $56,077 from First Clearing, LLC; (2) $13,193 from Great-West Trust Co., LLC; and (3) $7,620 from NADART. Petitioners reported only the distributions from First Clearing, LLC, and Great-West Trust Co., LLC.

Respondent's revenue agent George Krmpotich examined petitioners' 2015, 2016, and 2017 tax returns. On November 8, 2018, he obtained written approval from his immediate supervisor for an accuracy-related penalty for 2015. On that same day respondent sent petitioners a Letter 950, commonly referred to as a 30-day letter, advising them that they had 30 days to either agree or disagree with respondent before a notice of deficiency would be issued. Respondent issued the notice of deficiency (notice) on May 7, 2019. Respondent determined in the notice that petitioners were required to include the $7,620 IRA distribution from NADART in income for 2015. It also stated that the ranch property was an "activity not engaged in for profit" within the meaning of section 183 during the years in issue.

---

[2] Total Income includes all income (not exclusive of Wage Income and Schedule E Income) derived by petitioners during the taxable year as described on lines 7–22 of their Forms 1040, U.S. Individual Income Tax Return.

**[*6]** OPINION

The main issue in this case is whether petitioners entered into the cattle ranching business for profit and therefore whether the deductions were proper.[3]

### I.  *Burden of Proof*

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous.  Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Because respondent determined that petitioners did not engage in the cattle ranching business for profit, they bear the burden of proving otherwise.  Petitioners do not contend that the burden of proof should shift to respondent under section 7491(a).

### II.  *Evidentiary Issue*

On November 22, 2021, petitioners filed a Motion to Strike the Testimony of George Krmpotich, a revenue agent who testified.  They argue that the APA provides grounds to strike his testimony.  We disagree.  Deficiency cases are subject to de novo review, and so the APA does not apply to them.  *See Ax*, 146 T.C. at 161.  Because Mr. Krmpotich's testimony was consistent with a de novo proceeding, petitioners' Motion to Strike will be denied.

### III.  *For-Profit Business*

Taxpayers are generally allowed deductions for business-related and investment expenses.  *See* §§ 162, 212.  Under section 183(a), individuals are not allowed a deduction "if such activity is not engaged

---

[3] Petitioners made various arguments regarding the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–59.  A deficiency case in the Tax Court is not a review of an agency action pursuant to the APA.  *See Ax v. Commissioner*, 146 T.C. 153 (2016).

Petitioners contend that an audit for 2004 determined that they intended to make a profit from their ranch.  A taxpayer's liability is based on the merits and not on any previous record developed at the administrative level.  *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–28 (1974).  The acceptance or acquiescence in returns filed by a taxpayer for a previous year creates no estoppel against the Commissioner.  *See Dixon v. United States*, 381 U.S. 68, 72–73 (1965).  Furthermore, petitioners raised the issue regarding the 2004 audit during further trial.  According to the Court's September 14, 2021, Order, further trial was limited to issues included in the petitioners' pretrial memorandum.

**[\*7]** in for profit." "[I]f such activity is not engaged in for profit, no deduction attributable to such activity [is] allowed" except to the extent provided by section 183(b). § 183(a). Section 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit).

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." For expenses to be fully deductible under section 162 or 212, taxpayers must show that they are engaged in the activity with the primary objective of making a profit. *Westbrook v. Commissioner*, 68 F.3d 868, 875 (5th Cir. 1995), *aff'g* T.C. Memo. 1993-634; *Wolf v. Commissioner*, 4 F.3d 709, 713 (9th Cir. 1993), *aff'g* T.C. Memo. 1991-212.

The expectation of a profit need not be reasonable, but the taxpayer must conduct the activity with the actual and honest objective of making a profit. *Keating v. Commissioner*, 544 F.3d 900, 904 (8th Cir. 2008), *aff'g* T.C. Memo. 2007-309. Greater weight is given to objective facts than to the taxpayer's self-serving statement of intent. *King v. Commissioner*, 116 T.C. 198, 205 (2001); Treas. Reg. § 1.183-2(a) and (b).

The regulations provide a nonexhaustive list of nine factors that should be considered: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Treas. Reg. § 1.183-2(b). "No one factor is determinative," and it is not intended that "a determination is to be made on the basis that the number of factors . . . indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa." *Id.*

[*8]   A.   *Manner in Which the Taxpayer Carries On the Activity*

At the time of purchasing the ranch, petitioners interviewed and hired Mr. Palm to serve as foreman of the property. Given his significant experience in the ranching industry, he was tasked with overseeing the property and solving any problems that arose when petitioners were absent. In this way Mr. Palm served in a similar role to the managers that petitioner husband employed in his automotive businesses. We believe that hiring an experienced individual such as Mr. Palm to oversee the day-to-day operations of the ranch is an indication that petitioners conducted the ranch in a businesslike manner.

Additionally, petitioners maintained complete and accurate books and records for the ranch during the years in issue. At trial petitioner husband testified that he personally performed the accounting and payroll functions. He said that the ranch did not need the more sophisticated software used by his automotive businesses, which therefore would have been an unnecessary expenditure. In performing this function, petitioner husband used a single-entry form of accounting and maintained copies of all receipts and invoices for ranch-related purposes. He also provided the foreman with a credit card and a checkbook designated for ranch purchases only. To verify the accuracy of their reporting, petitioners employed their long-time accountant to review the books and records twice annually.

In their business plan, petitioners informed the bank that they intended to satisfy the mortgage payments by raising and selling cattle. This plan also included providing guided hunting expeditions on the property. Soon after purchasing the property, petitioners realized that these plans would not be profitable given unforeseen cost constraints. They accordingly abandoned them in favor of holding the ranch for investment purposes. Consequently, they reduced the cattle herd. They also declined to populate the property with game animals and decided against purchasing hunters' liability insurance.

We find that employing Mr. Palm and maintaining a reliable accounting system indicate that petitioners engaged in the ranching activity for profit. *See* Treas. Reg. § 1.183-2(b)(1) ("The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit."). This finding is reinforced by petitioners' shift to an investment focus once discovering that the operational one would

**[\*9]** be unprofitable. *See id.* ("A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive."). We find that this factor weighs in petitioners' favor.

### B.   *The Expertise of the Taxpayer or His Advisers*

Petitioners concede that they had zero ranching experience before making the investment in the property. And it does not appear that they prepared for the activity by conducting extensive studies themselves. They did, however, interview several individuals and ultimately hired Mr. Palm as foreman.

Respondent contends that the ranch's failure as a profitable enterprise belies Mr. Palm's expertise. We disagree. Mr. Palm had approximately two decades of ranching experience in the western United States before starting with petitioners. He had managed properties in six states and specifically two very large ones close to petitioners' property. Thus, despite the ranch's poor track record, we believe that Mr. Palm was as close to an expert as could be obtained.

Although petitioners instructed him to perform certain activities on the ranch, they deferred to his knowledge when it came to cattle management and the best practices for running the ranch. We find that hiring Mr. Palm and adhering to his counsel indicates a profit motive. *See* Treas. Reg. § 1.183-2(b)(2) ("Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices."). This factor weighs in petitioners' favor.

### C.   *The Time and Effort Expended by the Taxpayer in Carrying On the Activity*

Petitioners spent little time at the ranch. Petitioner wife testified to spending only two to four days per month there while petitioner husband testified to spending only two weekends per month there. At maximum, then, they spent six days per month on the ranch, which on an annual basis would be less than 20% of the year. This limited investment of time would generally weigh against their having a profit motive for purchasing the property. *See* Treas. Reg. § 1.183-2(b)(3) ("The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have

[*10] substantial personal or recreational aspects, may indicate an intention to derive a profit.").

Petitioners did employ Mr. Palm as foreman. He and his wife lived and worked on the property year round during the years in issue. As well, Mr. Palm—as an extension of petitioners—hired numerous individuals to help complete repairs on the property. Therefore, despite the fact that petitioners have not devoted a substantial amount of their personal time to ranch business, we do not believe this undercuts their profit motive. *See id.* ("The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity."). We find that this factor weighs in petitioners' favor.

D.  *Expectation That Assets Used in Activity May Appreciate in Value*

Petitioners testified that at the outset of purchasing the ranch they had two strategies in mind: an operational one and an investment one. The operational plan was to raise and sell cattle as well as provide guided hunting expeditions. If this plan failed, petitioners' secondary strategy was to improve the ranch and hold it as an investment property in hopes of one day selling it at a profit. As petitioners testified, they realized quickly that their operational plan was not feasible. They therefore shifted to their secondary plan and began making improvements to the existing structures and landscape to increase the investment value.

Petitioners' situation is envisioned by the regulations. *See* Treas. Reg. § 1.183-2(b)(4) ("The term *profit* encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation.").

A profit objective may be inferred from expected appreciation of the activity's assets only where the appreciation exceeds operating expenses and is sufficient to recoup accumulated losses of prior years. *See Golanty v. Commissioner*, 72 T.C. 411, 427–28 (1979), *aff'd without published opinion*, 647 F.2d 170 (9th Cir. 1981); *Hillman*

[*11] *v. Commissioner*, T.C. Memo. 1999-255. These cases do not require that the taxpayer recoup *all* past losses. Instead, the question is "whether [the taxpayer] would recoup the losses between the years in issue and the 'hoped-for profitable future.'" *Robison v. Commissioner*, T.C. Memo. 2018-88, at *21 (quoting *Helmick v. Commissioner*, T.C. Memo. 2009-220, slip op. at 28). "An overall profit is present if net earnings and appreciation are sufficient to recoup the losses sustained in the 'intervening years' between a given tax year and the time at which future profits were expected." *Id.* at *20 (quoting *Helmick*, T.C. Memo. 2009-220, slip op. at 27).

Petitioners purchased the property in early 2004 for approximately $2 million. At trial petitioner husband testified that the property was worth between $5.5 and $6 million during the years in issue. He also testified that as of the August 3, 2022, trial, the property was listed for $6.7 million. The question, then, is whether, given this sale price range, petitioners could recoup the losses incurred in the years in issue and going forward to the hypothetical sale date.

During each year in issue, the ranch averaged approximately $300,000 in losses. Assuming that this trend continues, petitioners could still expect to earn a profit even if we assume that the property is sold at the lower end of petitioner husband's estimates. The margin by which they earn a profit is dwindling each year. Given that a profit can still be earned, we find that this factor weighs in petitioners' favor.

E. *The Success of the Taxpayer in Carrying on Similar or Dissimilar Activities*

Petitioners have not engaged in similar activities in the past. But petitioner husband has engaged in the automotive sales and servicing business for many years. Originally starting with one dealership, petitioner husband has grown his automotive empire to include 23 dealerships in Southern California. Approximately 12 to 14 of these dealerships were operating at a loss when acquired. Petitioner husband was able to turn around all of these businesses and make them profitable. On that basis, we believe petitioners engaged in the ranch business for profit. *See* Treas. Reg. § 1.183-2(b)(5) ("The fact that the taxpayer has engaged in similar [or dissimilar] activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable."). This factor weighs in petitioners' favor.

[*12]  F.    *The Taxpayer's History of Income or Losses with Respect to the Activity*

Petitioners purchased the ranch in 2004.  Since then it has never produced a profit nor broken even.  This history would be indicative that the activity is not being engaged in for profit.  *See* Treas. Reg. § 1.183-2(b)(6) ("[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.").

Petitioners testified that an unforeseen drought took place after they purchased the property which decreased the viability of sustaining a cattle herd, one of the principal ways in which they intended to produce revenue.  Although droughts are not uncommon in the western United States, we find that the drought was beyond their control.  *See id.* ("If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit.").

That said, it is not apparent that the losses were sustained "*because of*" the unforeseen drought as required by the regulations.  *See Whatley v. Commissioner*, T.C. Memo. 2021-11, at *28 (finding that a drought did not cause the cattle operation's losses).  The cattle herd was decreased within months of petitioners' purchasing the ranch in 2004.  The losses at issue occurred nearly a decade later.  We are therefore unpersuaded by petitioners' argument that the drought can be blamed for the ranch's recent losses.

The other anticipated method of producing revenue was providing guided hunting expeditions.  The failure here seems more to be a lack of planning than any unforeseen circumstances.  Petitioners testified that shortly after purchasing the ranch they realized that the property was too small to support the type of animals that hunters seek.  They also discovered that purchasing the necessary hunting insurance for the property would be too expensive.  We do not see that this was an unforeseeable circumstance or customary business risk that arose.  Instead, this appears more to be a failure in business due diligence.  In the light of these considerations we find that this factor weighs against petitioners.

**[*13]** G.    *The Amount of Occasional Profits, if Any, Which Were Earned*

Petitioners have never earned a profit from the ranch business yet have incurred significant expenses.  In 2015 the ranch earned less than $1,000 yet incurred almost half a million dollars in expenses.  The years 2016 and 2017 are not much better: The ranch earned $12,485 and $10,627 while expending $235,580 and $239,751, respectively.  This indicates a lack of profit motive.  *See* Treas. Reg. § 1.183-2(b)(7) ("The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent.").  This factor weighs against petitioners.

H.    *The Financial Status of the Taxpayer*

As mentioned, petitioner husband has had many successful business endeavors throughout his life, primarily in the automotive industry.  During the years in issue petitioners reported total income of $11,099,715, $12,376,821, and $9,259,687, respectively.  The significant losses from the ranching activity served to reduce this income.  Therefore, in addition to the fact that petitioners had significant income from another source, the losses from the ranch activity generated substantial tax benefits.  This benefit is indicative of a lack of profit motive.  *See* Treas. Reg. § 1.183-2(b)(8) ("Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.").  This factor weighs against petitioners.

I.    *Elements of Personal Pleasure or Recreation*

Petitioners assert that they did not have personal motives for purchasing the ranch.  At trial they testified that they spent no more than two weekends per month at the property.  And when they did visit, they did not engage in any personal or recreational activities.  Instead their purpose was usually to check in with Mr. Palm and help him with any repairs.  This is indicative of a profit motivation.  *See* Treas. Reg. § 1.183-2(b)(9) ("The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved.").

Respondent argues that petitioners did derive pleasure from their trips to the property, noting that on some occasions they invited guests

**[\*14]** to the property and generally enjoyed enhancing it. Petitioners did not dispute this fact. But we do not think that undercuts their position. *See id.* We find compelling the fact that petitioners have numerous properties in desirable locations besides the ranch. Petitioners testified that at these homes they engage in true recreational activities such as hiking, biking, and boating. Thus despite taking some personal pleasure from the ranch property, we maintain that petitioners' primary motivation was to earn a profit. This factor weighs in their favor.

IV.    *Conclusion*

This is a close case. After weighing all the facts and circumstances, we conclude that petitioners engaged in their ranching activity for profit. Their activities cannot be characterized as a hobby. We do not sustain respondent's disallowance of the loss deductions related to the ranching activity under section 183.

V.    *Accuracy-Related Penalties*

Respondent determined accuracy-related penalties under section 6662(a) for the 2015 and 2016 underpayments. Since we have determined that petitioners did engage in a for-profit business, we reject the penalties associated with the deficiencies pursuant to the section 183 finding. Respondent also determined that petitioners failed to report an IRA distribution during 2015. Petitioners conceded that they should have reported the distribution. They nonetheless argue that the associated penalties should be voided or abated because respondent failed to satisfy section 6751.

According to our caselaw, "the Commissioner bears the burden of production with respect to the liability of an individual for any penalty." *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see* § 7491(c). The Commissioner satisfies that burden by presenting sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses. *Graev*, 149 T.C. at 493 (citing *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001)). This includes satisfying section 6751(b)(1), which provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

**[\*15]** The written supervisory approval is not required to take any specific form. *See Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 85–86 (2019). But it generally must be obtained no later than (1) the date on which the IRS issues the deficiency notice, or (2) the date, if earlier, on which the IRS formally communicates to the taxpayer the Examination Division's determination to assert a penalty. *See Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 15 (2020).

In *Kroner v. Commissioner*, 48 F.4th 1272 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73, the U.S. Court of Appeals for the Eleventh Circuit disagreed with the Tax Court regarding the timing of the section 6751(b) approval requirement. The Eleventh Circuit concluded that "the IRS satisfies [s]ection 6751(b) so long as a supervisor approves an initial determination of a penalty assessment before it assesses those penalties." *Id.* at 1276.

In *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), the U.S. Court of Appeals for the Ninth Circuit considered the timeline for obtaining supervisory approval of "assessable penalties," which are not subject to deficiency procedures. The Ninth Circuit held that, for an assessable penalty, supervisory approval is timely if secured before the penalty is assessed or "before the relevant supervisor loses discretion whether to approve the penalty assessment." *Id.* at 1074.

We follow the relevant precedent of the Court of Appeals to which an appeal would generally lie. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). In this case the appeal would lie in the Ninth Circuit, which has not addressed this issue in a deficiency case. Because the immediate supervisor's signature on the 30-day letter is timely under either standard, the Court does not address the potential conflict.

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(1), the underpayment is attributable to "[n]egligence or disregard of rules or regulations." Negligence includes "any failure to make a reasonable attempt to comply" with the internal revenue laws, and "disregard" includes "any careless, reckless, or intentional disregard." § 6662(c). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Treas. Reg. § 1.6662-3(b)(1).

**[\*16]** Petitioners conceded that they should have included the IRA distribution from NADART as income for 2015. The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that he or she had reasonable cause and acted in good faith. § 6664(c)(1); *see Higbee*, 116 T.C. at 446–47. Petitioners did not show reasonable cause. Accordingly, they are liable for the section 6662(a) penalty as it pertains to the underpayment related to the IRA distribution.

We have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*